**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|                               |   |                                |
|-------------------------------|---|--------------------------------|
| **Emanuel Rivera,**           | : |                                |
|                               | : |                                |
| **Petitioner**                |   | **CIVIL ACTION NO. 3:21-cv-1887** |
|                               | : |                                |
| **v.**                        |   | **(JUDGE MANNION)**            |
|                               | : |                                |
| **Morris L. Houser,**         |   |                                |
| **Superintendent SCI-Benner** | : |                                |
| **Township,**                 |   |                                |
|                               | : |                                |
| **Respondent,**               |   |                                |
|                               | : |                                |

**<u>MEMORANDUM</u>**

Emanuel Rivera is confined at the State Correctional Institution at Benner Township, Pennsylvania. (Doc. 1 at 1). He petitions for a writ of habeas corpus under 28 U.S.C. §2254, claiming that he is in the Commonwealth's custody in violation of the United States Constitution. (Doc. 1). Petitioner is serving a life sentence imposed for his convictions of first degree murder, robbery, and criminal conspiracy in the York County Court of Common Pleas. (Id.).

I.    BACKGROUND

A. Procedural Background

Following a joint trial with his co-defendant Eric Camacho-Rodriguez, a jury found Petitioner guilty of murder of the first degree, robbery, conspiracy to commit robbery, and conspiracy to commit burglary. (Docket Nos. CP-67-CR-0006999-2012 and CP-67-CR-0007000-2012). He was sentenced on July 31, 2013. (Id.).

Petitioner appealed the judgment of his sentence, challenging the sufficiency and weight of the evidence, but the Superior Court remanded the case because Petitioner had not filed a statement of the errors complained of on appeal as required by Pa. R. App. P. 1925(b). Commonwealth v. Rivera, 2014 WL 10919634, at *1 (Pa. Super. Ct. 2014). Following remand, the Superior Court affirmed Petitioner's judgment of sentence. 116 A.3d 676 (Table) (Pa. Super. Ct. 2014).  The Pennsylvania Supreme Court denied allowance of appeal. 141 A.3d 480 (Table) (Pa. 2016).

Petitioner filed a petition for post-conviction relief under Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. §§9541–46 (PCRA), in the Court of Common Pleas. (Doc. 1-2). His petition was denied, (Doc. 1-6), and he appealed from this denial to the Superior Court. (Doc. 1-7). The Superior Court affirmed the trial court's order, 249 A.3d 1154 (Table), 2021 WL

614058 (Pa. Super. Ct. 2021), and the Pennsylvania Supreme Court denied

allowance of appeal on September 8, 2021. 262 A.3d 1258 (Table) (Pa.

2021). Petitioner filed the instant petition on November 5, 2021. (Doc. 1).

### B. Factual Background

The charges against Petitioner and his codefendant stemmed from a

May 28, 2012 shooting and a May 31, 2012 incident. This petition relates

only to Petitioner's murder conviction for the May 28th shooting, so only the

portions of the trial pertaining to that charge will be discussed.

The Superior Court provided the following summary:

> Relevant to this petition, a person sitting on a porch across
> from where the murder occurred, Nick Drayden, testified at trial,
> and described two individuals he saw that night. [(Doc. 11-1] at
> 177-82). He testified that the shooting occurred at nighttime,
> between 9:00 p.m. and 10:00 p.m., near a park. (Id. at 178). He
> said he saw two males, who looked to be 16 or 17 years of age,
> walking across the park. (Id. at 179-80). One had a T-shirt on his
> head like a turban and both wore jeans and "wife beaters." (Id. at
> 180). Drayden testified that one was a little shorter than Drayden,
> who was 5'9", and the same individual had a lighter skin tone
> than Drayden. (Id. at 180-81). He said, however, that he did not
> get a good look at either individual's face. (Id. at 182). Drayden
> did not make an in-court identification of Rivera or Camacho-
> Rodriguez as one of the assailants.
>
> At trial, Detective Andy Baez testified about his interview of
> co-defendant Eric Camacho-Rodriguez. During the testimony,
> Baez changed references to Rivera contained in Camacho-
> Rodriguez's statement to the "other person":
>
> Q. Okay. Now, I know you started off by indicating that he had --
> you asked him about the backpack and the incident in Bantz

- 3 -

Park. What about—did you ask him anything about what occurred by Girard Park?

A. He said that he was not there with the other person and there were people that could tell the police that he was on George Street.

Q. Okay. Just so we're all clear, the incident by Girard Park, that was what occurred on May 28th, 2012 involving Felipe Bernabe, correct?

...

Q. Did he indicate if -- any further information?

A. He said that he was not with the other person.

Q. Okay. What happened next?

A. Why would the other person say you were there?

...

A. He and the other person were together before the incident happened and he continued to maintain that he was not there at the time of the shooting.

Q. What happened next?

A. He was told that a person we spoke with said that there was a person in the park that matched his general description that includes the little afro pony puff.

Q. Okay. Then what happened?

A. He was then told that a person we spoke with indicated that he was behind the shooter at the time of the shooting, and he said I was not there.

...

- 4 -

A. He was asked if the other person that said he was there was a liar. He indicated that the person is not a liar; however, he denied being there.

Q. Okay. If you can continue, detective.

A. He was asked why the other person would say that. He didn't know, but that he was not there in that moment when the other person shot him and the other person was telling the truth about the rest. What part was the other being truthful about? The –

...

Q. You can continue.

A. That the other person shot him. How do you --

...

A. So that day he was scared and he told the other person that he did not want to do it and the other person said that he was going with his friends by himself.

...

A. He was asked who his friends were. He said, his statement was, he said that there was a skinny tall black boy, a white skinny boy, and one with long hair. Those were the boys that left with him.

Q. And if you can --

A. He was asked if he knew their names and he said no.

Q. What happened next?

A. He said that the other person told him at the time of the shooting he didn't want to do it.

Q. Okay.

A. He also said that the black boy told him if you don't do it, I will do it, so they tried to make the other person look like a pussy so the other person did it. So in one moment, the other person got in a panic and the other person shot him.

Q. Did he indicate what the other person was trying to do?

A. He said that the other person was trying to get some money so we could eat.

Q. Did he indicate whether the person gave up the money?

A. He shook his head no.

Q. Okay. What happened next?

A. He indicated that the other person shot him. He was asked, why him? He said that he didn't know and he said again that he was not there.

Q. Did you further inquire as to why that particular person was chosen?

A. We asked him, why was the victim chosen? Did you know him? I don't know. They went and did it. The other person told me that he or she was scared at first and then he or she was running. The other person hid for like two days. Then the other person was hiding with me in an abandoned house where he, Eric Camacho, used to live. He then indicated that he and the other person stayed there for a couple nights and tried to survive until Friday.

Q. Okay.

A. After then, the other person was going to New York and Camacho was going to go somewhere with his mother and family. ...

Q. Okay. What happened next?

A. With reference to today, which would be the 31st, he said that the other person told him that something was going to go so that they could have money and they could eat.

Q. Okay.

A. He said that the other person didn't explain everything. He or she just said it's money. He then indicated that he needed money to eat so he went with the other person and he said that he was carrying the book bag the whole way. He said that he knew the police saw him with the book bag. He said that they were in the park and they were waiting for some of the other person's friends. He said that they were the ones that did the Girard Park incident with the other person. He said that he knew that the guy was dead.

Q. And let me just stop you. The guy as in Felipe Bernabe?

A. That is correct.

Q. Okay.

A. He said that the other person was thinking about it and he or she was thinking that he or she killed him. He was asked if he read the newspaper. He shook his head negative. He said that the other person thought they killed him because the other person hit him with the gun and was like, I think I killed him. He indicated that the other person told him that.

Q. Okay. Now, did you or Detective Spence ask how Mr. Camacho-Rodriguez ended up with the book bag?

A. We did.

Q. How did he respond?

A. The other person left it with a friend of ours and he or she was holding a bag with the bullets and the gun. He indicated that he

knew the bullets and gun were inside the bag. He was asked how he got the bag. He indicated that friend brought it to him on 409 South George Street at around 6 p.m. ...

(Doc. 11-1 at 544–57).

The trial court gave the following limiting instruction to the jury:

> There's another rule that restricts the use by you the jury of evidence offered to show that the defendants, Emanuel Rivera and Eric Camacho-Rodriguez, made a statement concerning the crime charged. A statement made before trial may be considered as evidence only against the defendant who made that statement. Thus, you may consider the statement as evidence against the defendant speaking if you believe he made the statement voluntarily. You must not, however, consider that statement as evidence against the other defendant. You must not use the statement by one defendant in any way against the other defendant.

(Id. at 694-95).

During jury instructions, the court did not give a *Kloiber*[1] charge, and Rivera's counsel did not ask for one. The jury found Rivera guilty as above, and the court sentenced Rivera to life imprisonment for the murder conviction and a consecutive four to eight year term of imprisonment for the conspiracy to commit robbery conviction. The court found the conviction for conspiracy to commit burglary merged and imposed no further penalty for the robbery and second conspiracy to commit robbery conviction.

2021 WL 614058, at *1–3.

---

[1] Commonwealth v. Kloiber, 106 A.2d 820, 826–27 (Pa. 1954).

Before the interview of co-defendant Camecho-Rodriguez was recounted, an interview between Detective Jeffrey Spence and Petitioner, which had been recorded and transcribed, was read into the record. (Doc. 11-1 at 500–532). All references to Camecho-Rodriguez were similarly replaced with "the other person." (Id. at 482–83).

In the interview, Petitioner was asked about the day of the killing. He said that a "Mexican guy" had entered his house and stole a radio that his father had given him, and he "got furious." (Id. at 509). He followed the man, the man tried to fight him, and Petitioner "responded" with the gun later found by the police. (Id. at 510, 517). He also told police that the "other person" was behind him at the time of the shooting. (Id. at 517). When asked what he did after he shot him, Petitioner responded, "I left." (Id. at 518).

Testimony was also given by Linda Perez, who was sitting on the porch with Mr. Drayden that night. (Doc. 11-1 at 160–62). She testified that she "noticed two gentlemen walking in the park," she heard them speaking Spanish, and though it was dark out, she could tell that they were not Black. (Id. at 162–65). According to Perez, the men walked toward a pickup truck which had pulled up the street. (Id. at 165). She observed that "at first, it looked like they were talking to him and then all of a sudden they started

fighting." (Id. at 166). She then turned around to look at Drayden and heard gunshots. (Id.). After that, Ms. Perez "watched two guys run away." (Id.).

Following Mr. Drayden and Ms. Perez, York Police Department Patrolman John Buchkoski testified about the night of the killing. (Doc. 11-1 at 199). Officer Buchnowski recalled that he was dispatched for a shots fired call around 10:30pm. (Id. at 200). He was the first officer on the scene and observed that two people were standing on the sidewalk near where a man was down on the road. (Id. at 201). The man had a "large lump" on his right side above his belt line and there was blood around him. (Id. at 201–02). Officer Buchkowski took out two forms of identification that were in the man's wallet, and noted that it did not appear that anyone else had gone through the man's pockets. (Id. at 202, 204).

Karen Ferguson, who was at an adjacent park the evening of the killing and was a neighbor to the deceased, also testified. (Id. at 206–08). She saw a man at the park who she said was about 5'9'' or 5'10'', with light complexion and hair in a "bun or afro puff," and wearing a white t-shirt and jeans. (Id. at 210–11). And as she saw him do every evening, the deceased pulled his truck out from his driveway near the park, and parked it again. (Id. at 209–11). Ms. Ferguson went home before the deceased was shot. (Id. at 212–14).

The Commonwealth next called Officer Jeremy Mayer, who had investigated the shooting. (Id. at 219–20). Officers collected blood swabs, swabs of the truck, and photographs of the scene. (Id. at 224–27). Mayer testified that the deceased's vehicle was situated directly below a street light, and that there were other lights in and around the park that shone at night. (Id. at 230). He further testified that no firearm was recovered at the scene, but a bullet was. (Id. at 232–33).

Jaycott Rivera-Rodriguez also testified for the Commonwealth. (Id. at 240). He knew Petitioner socially, and identified him in court. (Id. at 240–41). Mr. Rivera-Rodriguez testified that, three days after the killing, Camacho-Rodriguez called him and asked to talk in person. (Id. at 244–45). Camacho-Rodriguez and Petitioner then arrived at his house and asked him if he heard about the murder. (Id. at 246–47). He said no, and Camacho-Rodriguez "pointed at [Petitioner] and said he was the one that pulled the trigger" while both were laughing. (Id. at 247). After Camacho-Rodriguez said that, Mr. Rivera-Rodriguez testified, Petitioner then confirmed that he had shot the victim. (Id.). According to Rivera-Rodriguez, Petitioner told him "exactly what he did": "[H]e went to go get a car, went behind the guy, [the guy] wouldn't give up the keys so he shot him." (Id.). The two also told the story to Mr. Rivera-Rodriguez's father. (Id. at 247–48).

The Commonwealth offered Pennsylvania State Trooper Todd Neumeyer as an expert in firearms and tool mark examinations. (Doc. 11-1 at 388–393). Trooper Neumeyer had analyzed a bullet recovered from the scene and a caliber .22 rifle that police later recovered. (Id. at 395–97). He opined that certain characteristics of the bullet matched the rifle, but due to the bullet's mutilation he could not determine whether the rifle was the only one that could have shot it. (Id. at 410).

Dr. Samuel Land, who performed an autopsy on the victim, was offered as an expert in forensic pathology. (Id. at 330–336). Dr. Land testified that the victim died as a result of a gunshot wound to his back. (Id. at 338). His observations indicated to him that "the gun was pressed up against the skin when the trigger was pulled." (Id. at 341–42). Dr. Land's opinion was that the manner of death was homicide. (Id. at 345).

Dr. Katherine Cross gave testimony as an expert in forensic biology. (Doc. 11-1 at 441–44). Dr. Cross analyzed swabs from the exterior of the victim's vehicle, the victim himself, and the gun recovered by police and reference DNA from Petitioner and Camacho-Rodriguez. (Id. at 446). In her opinion, the DNA obtained from the gun could not have come from either of the codefendants, but it did match the reference from the victim, though the reference was incomplete—so the victim could not "be excluded as being the

source." (Id. at 460). Nor did any of the other tested items exhibit a match with the codefendants. (Id. at 453–56).

Both Camacho-Rodriguez and Petitioner elected not to testify. (Id. at 604).

In closing, Petitioner's counsel emphasized the judge's instruction that nothing Camacho-Rodriguez said in his statement could be used against Petitioner. (Id. at 614–15). He acknowledged Petitioner's statement about the victim stealing his radio and Petitioner shooting him, but suggested that the entire statement should be disbelieved. (Id. at 615). For one thing, counsel said, the Commonwealth was "going to argue that" the statement was a lie except for Petitioner's admission to the shooting. (Id.). For another, the statement lacked detail. (Id. at 616). And observing that Petitioner was "a fairly large individual" and had lost weight since the shooting, counsel argued that he did not match the descriptions given by eyewitnesses of "thin" or "regular build" individuals. (Id. at 615–16). Counsel also attempted to discredit Jaycott and highlighted the inconclusive results of Dr. Cross's DNA report. (Id. at 620–22).

The Commonwealth argued that Drayden's and Perez's descriptions of the assailants matched the defendants. (Id. at 668–69). It further argued that their narratives and Dr. Land's testimony corroborated the story Jaycott

said Petitioner had told her. (Id. at 669). The prosecutor also discussed the defendants' statements. (Id. at 673). He highlighted Petitioner's admission in his own statement, but did not reference Camacho-Rodriguez's implication of Petitioner. (Id. at 674–75).

With regard to the May 28th murder charges, the jury found Petitioner guilty of first-degree murder and Camacho-Rodriguez guilty of second-degree murder. (Id. at 765–67).

## II.    LEGAL STANDARD

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a).

### A. Exhaustion

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

> (A) the applicant has exhausted all the remedies available in the courts of the State; or
> (B)(i) there is an absence of available State corrective processes; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. §2254(b).

Exhaustion requires that the petitioner "give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). This means that he must "invoke[e] one complete round of the State's established appellate review process." Id. "In Pennsylvania, a defendant exhausts his state remedies for a federal claim either by raising the claim on direct appeal or in a petition for collateral relief under the PCRA." Bennet v. Superintendent Graterford SCI, 886 F.3d 268, 280 (3d Cir. 2018). PCRA petitioners "need not seek review from the Pennsylvania Supreme Court in order to give the Pennsylvania courts a 'full opportunity to resolve any constitutional claims.'" Lambert v. Blackwell, 387 F.3d 210, 233 (3d Cir. 2004).

To exhaust a claim, the petitioner must "fairly present[]" that claim to the state courts." Picard v. Connor, 404 U.S. 270, 275 (1971).

> That is, the petitioner must have presented a federal claim's factual and legal substance to the state courts in a manner that put the state courts on notice that a federal claim was being asserted. If a petitioner's federal claim was not "fairly presented" and further state-court review is no longer available under state law, the claim is procedurally defaulted and may be entertained in a federal habeas petition only if there is a basis for excusing the procedural default.

- 15 -

Wilkerson v. Superintendent Fayette SCI, 871 F.3d 221, 228 (3d Cir. 2017) (internal quotations, citations, omissions, and alterations omitted).

"[W]hen a claim has not been fairly presented to the state courts (i.e., is unexhausted) and there are no additional state remedies to pursue" or when it "is properly asserted in the state system but not addressed on the merits because of an independent and adequate state procedural rule," that claim is procedurally defaulted. Rolan v. Coleman, 680 F.3d 311, 317 (3d Cir. 2012). Federal courts will not review the merits of procedurally defaulted claims. Martinez v. Ryan, 566 U.S. 1, 9 (2012).

## B. Review of state court decisions

For claims raised in a habeas petition that were decided on the merits by the state courts, federal courts review the state-court adjudication to determine whether it:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d)(1).

Regarding this standard of review, the Third Circuit has explained that:

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. A decision involves an "unreasonable application" of federal law if no fairminded jurist could agree with the state court's decision.

Wilkerson, 871 F.3d at 228 (internal citations and quotation marks).

"For purposes of §2254(d)(1), an *unreasonable* application of federal law is different form an *incorrect* application of federal law." Harrington v. Richter, 562 U.S. 86, 101 (2011). Reviewing the state court's decision, "a habeas court must determine what arguments or theories supported or … could have supported" it, and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the United States Supreme Court. Id. at 102. "If that standard is difficult to meet, that is because it was meant to be." Id. It requires a petitioner to "show that that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

## C. Ineffective Assistance of Counsel

"It has long been recognized that the right to counsel" guaranteed by the Sixth Amendment "is the right to effective assistance of counsel."

- 17 -

McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). Ineffective assistance of counsel claims are governed by the standard established in Strickland v. Washington, 466 U.S. 668 (1984). Harrington, 562 U.S. at 92.

Under Strickland, one asserting ineffective assistance of counsel must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687.  The first prong requires a showing that "counsel's representation fell below an objective level of reasonableness." Harrington, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 688). To establish the second, "a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quoting Strickland, 466 U.S. at 694).

### D. Due Process

The Fourteenth Amendment commands that a State "shall" not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV §1. The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The reasonable-doubt standard

"provides concrete substance for" the "axiomatic and elementary principle" that the accused are presumed innocent. Id. at 363.

Relatedly, due process guarantees criminal defendants a fair trial, and the Constitution "defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." Strickland, 466 U.S. at 684–85. The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

"Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." Strickland, 466 U.S. at 685.

But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." Herrera v. Collins, 506 U.S. 390, 399 (1993). The due process protections thereafter afforded him differ from those afforded the accused. See District Attorney's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 68–69 (2009). Although state-created rights and those essential to their

realization can trigger due process protection, <u>Connecticut Bd. of Pardons v.</u> <u>Dumschat</u>, 452 U.S. 458, 463 (1981), the states have "more flexibility in deciding what procedures are needed in the context of postconviction relief" than in ordinary criminal procedure. <u>Osborne</u>, 557 U.S. at 69.  In assessing the constitutional sufficiency of state postconviction procedures, "the question is whether consideration of [a petitioner's] claim within the framework of the State's procedures … offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental, or transgresses any recognized principle of fundamental fairness in operation." <u>Id.</u> at 69. So "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." <u>Id.</u>

### III.   DISCUSSION

Petitioner advances four grounds for relief. (Doc. 1).

### A. Ground One: Ineffective assistance of counsel – failure to request a <u>Kloiber</u> instruction

At trial, Nick Drayden testified that he witnessed the shooting at issue in this case from the porch across the street. (Doc. 11-1 at 177–78). According to Drayden, the shooting occurred between nine and ten o'clock

at night, so it was dark out, which affected his ability to see the assailants. (Id. at 178). He described their appearance, but testified that he "didn't get a real good look at their faces." (Id. at 182).

Petitioner argues that his trial counsel should have requested a Kloiber jury instruction regarding Drayden's testimony. (Doc. 1 at 29–32).

In Commonwealth v. Kloiber, 106 A.2d 820, 826–27 (Pa. 1954), the Pennsylvania Supreme Court considered a challenge to a trial court's refusal to instruct a criminal jury to view certain eyewitness identification testimony "with great caution." The court explained that the necessity of such a charge depends on the circumstances surrounding the identification:

> Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to testify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution ….
> On the other hand, where the witness is not in a position to clearly observe the assailant, or he is not positive as to identify, or his positive statements as to identify are weakened by qualification or by failure to identify defendant on one or more occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

106 A.2d at 826–27.

The type of instruction described in the latter charge has become known as a "Kloiber charge." See Commonwealth v. Brown, 196 A.3d 130, 163 (Pa. 2018).

- 21 -

Petitioner contends that "[a]lthough … Drayden technically did not identify Petitioner, he was there to potentially identify Petitioner, and the jury would have accepted the Commonwealth witness's testimony as identifying … Petitioner." (Doc. 1 at 30). Therefore, he asserts, "it was incumbent upon counsel to request that the jury be instructed to view the identification with caution." (Id.).

The Commonwealth counters that "[s]uch an instruction was unnecessary because Witness-Drayden did not even attempt to identify [Petitioner] as one of the assailants, buy only gave a brief description of his general appearance, clothing, and skin color." (Doc. 11 at 28).

The Pennsylvania Supreme Court has recently instructed that:

> A Kloiber charge is appropriate when the accuracy of the testimony of an eyewitness' identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution. A trial judge must provide the instruction where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past. A Kloiber charge is not mandatory where an eyewitness has had protracted and unobstructed views of the defendant and consistently identified the defendant throughout the investigation and at trial.

> Brown, 196 A.3d at 163 (internal quotations and citations omitted).

The Superior Court here affirmed the PCRA court's conclusion that no Kloiber instruction was required because Drayden did not identify Petitioner. 2021 WL 614058, at *7.

Petitioner acknowledges that Drayden "technically did not identify" him, but posits that the jury nonetheless would have accepted Drayden's testimony as an identification. (Doc. 1 at 30).

The court is unconvinced by this argument. Mr. Drayden described the assailants' physical characteristics—including their gender, age, height, and skin tone—and clothing. (Doc. 11-1 at 179–81). But he also testified that, as it was nighttime, the lighting affected his ability to see them and that he "didn't get a real good look at their faces." (Doc. 11-1 at 182). At no point did Drayden positively identify Petitioner as one of the assailants he saw. And his testimony that he "didn't get a real good look at their faces" seems to disclaim an ability to positively identify Petitioner.

Petitioner's expansive concept of identification testimony would include descriptions consistent with a defendant's appearance. But Kloiber was not concerned with circumstantial evidence of that kind.

Kloiber instead spoke of "positive identification," 106 A.2d at 826–27, that is, a witness's testimony that the person he saw commit a crime *is* the defendant present in court. Testimony of this type is especially powerful. See

Commonwealth v. Walker, 92 A.3d 766, 779 (Pa. 2014) ("[Eyewitness identification] is arguably the most powerful form of evidence. As Justice William Brennan noted, 'There is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" (quoting Watkins v. Sowders, 449 U.S. 341, 352 (1981) (Brennan, J. dissenting))).  As Kloiber recognized, though, such testimony may contain indicia of uncertainty, sometimes enough that the "accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution." 106 A.2d at 827; see also Walker, 92 A.3d at 779 ("Because eyewitnesses can offer inaccurate, but honestly held, recollections in their attempt to identify the perpetrator of a crime, eyewitness identifications are widely considered to be one of the least reliable forms of evidence.").

A cautionary instruction of the nature contemplated by Kloiber simply does not apply where the witness has *not* identified the defendant. Testimony regarding the assailant's appearance is merely circumstantial evidence from which the jury may infer a defendant's involvement in the crime. Positive identification testimony goes a step further by making that connection for the jurors (who remain free to reject it).

Where, as here, no identification has been made, the extra caution due such evidence is not warranted. The limitations of Mr. Drayden's testimony were made known to the jurors by his testimony that the nighttime lighting affected his ability to see the assailants and that he did not get a good look at their faces. (Doc. 11-1 at 181–82). Disclosure of these circumstances sufficiently equipped them to assess the credibility of Drayden's observations. More importantly, there was no need for the jury to determine whether an identification was accurate, for there *was no* identification. At best, to have instructed the jury "to view the identification with caution," as Petitioner now proposes, (Doc. 1 at 30), would have served to confuse: by referencing an identification that did not occur, such an instruction may have been understood as suggesting that Mr. Drayden *had* identified Petitioner.

Precedent also would have reasonably dissuaded counsel from requesting a <u>Kloiber</u> charge. "[W]hen a witness does not identify the defendant in court or declines to identify the defendant in court, a <u>Kloiber</u> instruction is not required." <u>Commonwealth v. Colon</u>, 230 A.3d 368, 376 (Pa. Super. Ct. 2020) (citing <u>Commonwealth v. Sanders</u>, 42 A.3d 325, 335 (Pa. Super. Ct. 2012)). <u>Colon</u> concluded that the appellant's trial counsel could not have been ineffective for failing to object to the trial court's refusal to give a <u>Kloiber</u> charge for witnesses who did not identify him at trial.  230 A.3d at

376. And <u>Sanders</u>, in which the witnesses at issue had previously identified the appellant in statements to the police but declined to identify him at trial, held that the trial court had not erred in failing to give a <u>Kloiber</u> charge regarding those witnesses.[2]

In sum, trial counsel's decision not to request a <u>Kloiber</u> charge was reasonable. The circumstances of this case did not warrant such a request, the charge could have served only to confuse the jury, and Superior Court precedent weighed against it. So counsel was not thereby ineffective. Accordingly, this court cannot conclude that the Superior Court's decision to reject this ground was contrary to, or involved an unreasonable application of, clearly established Federal law.

### B. Ground Two: Ineffective assistance of counsel – failure to object to admission of co-defendant's statement

Petitioner next challenges his trial counsel's failure to object to the admission of Detective Baez's testimony recounting his interview of co-defendant Eric Camacho-Rodriguez. (Doc. 1 at 7).[3] He contends that

---

[2] The trial court in <u>Sanders</u> had instructed the jury, regarding the previous identifications, to consider whether they were qualified by hedging or inconsistencies and to consider all other circumstances under which they occurred. 42 A.3d at 335.

[3] Petitioner also now objects for the same reason to Jacyott Rivera-Rodriguez's testimony that Camacho-Rodriguez told him that Petitioner had

*(footnote continued on next page)*

admission of this statement violated his Sixth Amendment right to "be confronted with the witnesses against him." U.S. Const. amend. VI.[4] (Doc. 1 at 32–36).

As noted *supra*, Petitioner was tried jointly with Camacho-Rodriguez. Mr. Camacho-Rodriguez elected not to testify. (Doc. 11-1 at 604). But Detective Baez testified about an interview he conducted of Camacho-Rodriguez. (Id. at 541–57). In that interview, Camacho-Rodriguez had said that Petitioner was the shooter. (Id. at 552). Due to the joint nature of the trial, any references to Petitioner in Baez's testimony about the interview were replaced with "the other person." (Id. at 482–83).

After all the evidence was presented, the trial court gave the following instruction:

> A statement made before trial may be considered as evidence only against the defendant who made that statement. Thus, you may consider the statement as evidence against the defendant speaking if you believe he made the statement voluntarily. You must not, however, consider that statement as evidence against the other defendant. You must not use the statement by one defendant in any way against the other defendant.

(Doc. 11-1 at 694–95).

---

committed the murder. (Doc. 1 at 34). But he did not raise this issue to the Superior Court. (See Doc. 1-8 at 13).

[4] The Confrontation Clause is applied to the States through the Fourteenth Amendment's Due Process Clause. Pointer v. Texas, 380 U.S. 400, 406 (1965).

The Confrontation Clause "forbids the introduction of out-of-court 'testimonial' statements unless the witness is unavailable and the defendant has had the chance to cross-examine the witness previously." Samia v. United States, 599 U.S. 635, 644 (2023) (citing Crawford v. Washington, 541 U.S. 36, 53–54 (2004)). "[A] defendant's Sixth Amendment confrontation right is violated when a non-testifying co-defendant's extrajudicial statement inculpating the defendant is introduced at a joint trial, even if a jury is instructed that the confession may be considered as evidence only against the declarant." Eley v. Erickson, 712 F.3d 837, 856 (3d Cir. 2013) (citing Bruton v. United States, 391 U.S. 123 (1968)). By contrast, a confession that is "redacted to eliminate not only the defendant's name, but any reference to his or her existence," and accompanied by a proper limiting instruction does not violate the Confrontation Clause. Richardson v. Marsh, 481 U.S. 200, 211 (1987). But "redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to Bruton's unredacted confessions as to warrant the same legal results." Gray v. Maryland, 523 U.S. 185, 195 (1998).

In reviewing Petitioner's ineffective assistance of counsel claim, the first task is to determine whether the admission of Camacho-Rodriguez's redacted statement worked a Bruton violation. See Riggns v. McGinley, 18-

4429, 2022 WL 943739, at *6 (E.D. Pa. Jan. 4, 2022), *report and recommendation adopted by* 2022 WL 911142 (E.D. Pa. Mar. 29, 2022); See Fogg v. Phelps, 414 Fed App'x 420, 427 (3d Cir. 2011) (non-precedential) ("The ineffective assistance claim is parasitic on the substantive Sixth Amendment claim; to prevail under Strickland, [the petitioner] must necessarily prove the Bruton error was substantial and injurious.").

After this petition was filed and the Commonwealth responded to it, the Supreme Court considered Bruton's application to a similarly redacted confession. The defendant in Samia, 599 U.S. at 640, was tried jointly with one Stillwell for murder-for-hire and conspiracy to commit murder-for-hire. Stillwell had confessed prior to trial that he drove the van involved in the murder, but had told law enforcement that Samia shot the victim. *Id.* Because Stillwell would not testify, his confession was presented at trial through a DEA agent, who referred to Samia throughout as the "other person," including in recounting Stillwell's statement implicating Samia:

> Q. Did [Stillwell] say where [the victim] was when she was killed?
> A. Yes. He described a time when the *other person* he was with pulled the trigger on that woman in a van that he and Mr. Stillwell was driving.

*Id.* at 641–42 (alterations in original). The trial judge instructed the jury that Stillwell's testimony should not be considered as to Samia. *Id.* at 642.

The Court reviewed <u>Bruton</u>, <u>Richardson</u>, and <u>Gray</u>, and explained that "[v]iewed together," these "precedents distinguish between confessions that directly implicate a defendant" to which <u>Bruton</u>'s rule applies, "and those that do so indirectly," to which it does not. *Id.* at 648–53. It concluded that the "admission of Stillwell's confession, accompanied by a limiting instruction, did not run afoul of this Court's precedents." *Id.* at 653.

> Stillwell's confession was redacted to avoid naming Samia, satisfying <u>Bruton</u>'s rule. And, it was not obviously redacted in a manner resembling the confession in <u>Gray</u>; the neutral references to some "other person" were not akin to an obvious blank or the word "deleted."
>
> *Id.*

<u>Samia</u> resolves Petitioner's Confrontation Clause argument. Like the confession there, Camacho-Rodriguez's confession was redacted so that references to Petitioner were replaced with "the other person." This court cannot say that these "neutral references to some 'other person'" resembled the confession in <u>Gray</u> any more than those in <u>Samia</u>. And this confession was also accompanied by a limiting instruction to the jury that it could not consider that confession as evidence against Petitioner. So, according to <u>Samia</u>, Petitioner's Confrontation Clause right was not violated by the admission of Camacho-Rodriguez's redacted confession with a limiting instruction. Petitioner is therefore not entitled to habeas relief on this ground.

**C. Ground Three: Ineffective assistance of counsel – failure to request jury instruction regarding Petitioner's statement to police**

Third, Petitioner asserts that his trial counsel was ineffective "for failing to request [a] jury instruction to disregard Petitioner's inculpatory statement to the police if they determined it was involuntary." (Doc. 1 at 9).

But Petitioner did not present this claim to the Superior Court. See 2021 WL 614058, at *4. It is therefore procedurally defaulted. Rolan, 680 F.3d at 317.

Still, "a prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." Martinez, 566 U.S. at 10. As relevant here:

> When a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral review proceeding, where the claim should have been raised, was ineffective under the standards of Strickland. To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.
>
> Id. at 13–14.

- 31 -

Petitioner avers that he did not exhaust this ground because his "PCRA counsel did not permit exhaustion." (Doc. 1 at 9). According to Petitioner, "[w]hen [he] was granted a hearing on PCRA issues, he was not afforded counsel in accordance with" the Pennsylvania Rules of Criminal Procedure. (Id.).

For non–death penalty cases, an unrepresented defendant shall be appointed counsel for his first PCRA petition when he "satisfies the judge that [he] is unable to afford or otherwise procure counsel." Pa. R. Crim. P. 904(C).

Petitioner raised this claim in his original PCRA petition. (Doc. 1-2 at 11–15). The trial court appointed counsel, and counsel filed a no-merit letter and a motion to withdraw. 2021 WL 614058, at *3.[5] The court granted counsel's motion to withdraw but did not then rule on the petition. Id. Petitioner thereafter filed a motion opposing counsel's no-merit letter and withdrawal motion. (Doc. 1-5). Regarding this ground, Petitioner wrote:

> Your defendant agrees with [trial counsel] in that after review of the underlying circumstances, there is no avenue for

---

[5] "When counsel concludes that a PCRA petitioner has no viable issues, counsel is required to submit a letter to the PCRA court explaining the basis for his no-merit conclusion. This is commonly called a *Turner*/*Finley* letter. If the court agrees, counsel is permitted to withdraw, and the petitioner may proceed *pro se* or obtain private counsel." Commonwealth v. Bradley, 261 A.3d 381, 395 n.14 (Pa. 2021) (citing Commonwealth v. Turner, 544 A.2d 927, 928–29 (1988); Commonwealth v. Finley, 550 A.2d 213 (1988)).

relief on this issue, and your defendant hereby abdicates the assertion of this issue for the purposes of post conviction relief.

(Id. ¶19). The court held a hearing on the petition, in which it "adopted the position of PCRA Counsel in the *Turner/Finley* letter that there is no arguable merit to [Rivera's] PCRA [petition]," and dismissed the petition. 2021 WL 614058, at *4.

So Petitioner was appointed counsel for his PCRA petition, and counsel withdraw according to "the judicially sanctioned *Turney/Finley* process." Jenkins v. Superintendent of Laurel Highlands, 705 F.3d 80, 90 (3d Cir. 2013). And Petitioner has not shown that his PCRA counsel was ineffective for failing to raise this claim before the trial court. Rather, counsel reviewed this claim and provided an explanation to the court as to why it was meritless. Petitioner himself agreed with counsel's assessment and withdrew the claim. So there is no indication that his PCRA counsel, or his lack of PCRA counsel following withdrawal, prevented Petitioner from exhausting this claim.

For these reasons, the court concludes that Petitioner has not established cause for default. So this ground, which is procedurally defaulted without cause, will not be reviewed.

**D. Ground Four: Due process – state courts' denial of application for PCRA counsel**

Finally, Petitioner contends that he was deprived of his right to procedural due process by the PCRA court's denial of his application for counsel at the hearing. (Doc. 1 at 10).

As discussed *supra* Section III.C, Petitioner was appointed PCRA counsel, but the court granted counsel's motion to withdraw in accordance with the *Turner/Finley* procedure. Before the subsequent hearing on his petition, the trial court denied Petitioner's request for new counsel because his "appointed counsel … found no merit in his position, which the court affirmed." 2021 WL 614058, at *3.

As to Petitioner's initial argument that the trial court's denial of his request for counsel was contrary to Pennsylvania law, (Doc. 1 at 41–44), that is not a ground for habeas relief. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law.").

And the court cannot conclude that the trial court's denial of Petitioner' request for new counsel deprived him of due process, for "the Due Process Clause does not require that the state supply a lawyer" for postconviction relief proceedings. Pennsylvania v. Finley, 481 U.S. 551, 557 (1987). Nor can the court conclude that Pennsylvania's procedure for permitting PCRA

counsel to withdraw is fundamentally inadequate to vindicate the right to PCRA counsel provided by the Commonwealth. See Osborne, 557 U.S. at 69. That procedure requires an "independent review" of the record by counsel, a letter detailing the "nature and extent of" that review and explaining why each issue is meritless, and an independent review of the record by the PCRA court. Finley, 550 A.2d at 393–94; Turner, 544 A.2d 927, 928–29. This procedure affords petitioners a fair opportunity to receive careful attorney consideration of all their claims and to have their potentially meritorious claims presented by counsel.

So this ground does not entitle Petitioner to habeas relief either.

### E. Certificate of Appealability

Appeals may not be taken from final orders in habeas proceedings brought by state prisoners unless a circuit justice or judge issues a "certificate of appealability." 28 U.S.C. §2253(c)(1)(A). "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." Id. §2253(c)(2). This standard is satisfied by a demonstration that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

The court concludes that jurists of reason could not disagree with its resolution of Petitioner's constitutional claims or conclude that that they are adequate to deserve encouragement to proceed further. So a certificate of appealability will not issue.

## IV.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus will be denied. A certificate of appealability will not issue. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: July 30, 2024**
21-1887-01

- 36 -